## Borders v. Commonwealth.

(Decided Jan. 30, 1934.)

578

DUDLEY L. CLARKE and RAYMOND C. ARNY for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

The appellant, Edward Borders, was indicted, tried, and convicted in the criminal branch of the Jefferson circuit court for the crime of rape, and sentenced to confinement in the penitentiary for ten years. He appeals.

The defendant is a married man, 24 years of age. The prosecuting witness, Miss Pearl Richardson, single, age 21 years, was living with her sister, Mrs. Jones, in the city of Louisville. About two years before the alleged crime was committed, defendant had met the prosecutrix while she was staying at the Girl's Friendly Inn, an institution in Louisville where unmarried working girls live. Soon after their acquaintance defendant and prosecutrix had two dates, on one of which they attended a movie, and on the other occasion they attended a boat dance. After these two engagements, according to the evidence of the prosecutrix, they did not see each other again until Friday before the Wednesday night, June 7, 1933, the time the alleged crime was committed. On Friday night, June 2, the prosecutrix and her sister Ann were on the streets in the city of Louisville, and while on their way home they were accosted by appellant and one Ike Menzin, who invited them for a car ride. They accepted, and during the ride they stopped at several places including a dance hall. The prosecutrix says she did not engage in the dance as she was afraid to do so because of her physical condition as a result of a major operation she had had about three months previous, and that she was still in a very weakened condition and unable to work. However, there is

a conflict in evidence as to whether she engaged in the dance, other witnesses stating that she did engage in the dance. They returned home about midnight. Appellant asked her for a date the following Wednesday night and said he would bring his friend for her sister Ann. Pursuant to this engagement appellant called at the home of the prosecutrix about 8 o'clock p. m. Appellant, his friend Milton House, and the two girls decided to take a car ride. They went out in the west end of the city and stopped at different places, procured whisky, ginger ale, and other drinks. The prosecutrix says she did not drink any whisky, but admits that she drank ginger ale. Appellant says that she drank what is known as a "Ginger Ale Highball," and in this he is corroborated by House. According to the evidence of defendant, they stayed at the Sailor Inn, where they drank and danced for about one and one-half hours, and at intermissions between dances, they would go to the car and take a drink. Prosecutrix again denied engaging in the dance on this occasion and also denies drinking anything but ginger ale. After leaving Sailor Inn they proceeded to go out on the Bardstown road to another inn where there was a dance, but did not go in. They then drove out on the Bardstown road and parked the car. The prosecutrix' sister Ann and her friend, House, stayed in the car while defendant and prosecutrix took a walk down the road. The prosecutrix testified that they went about a half a block and it was a light night, the moon shining brightly; that while they were walking down the side road appellant asked her what she was going to do the next night, and she told him that she was going to stay at home; that he insisted that she give him a date for the next night, but she refused; and after walking on a little distance she said: "I am going back to the machine." Appellant said: "Oh, let's sit down." "I said, 'No, I am going back to the machine.'" She further stated, in substance, that when she turned and started back toward the machine appellant knocked her down; that she was excited and scared and fought with him and begged to him, but that he overpowered her and had intercourse with her by force and against her will and consent. They then went back to the car and proceeded to go home. Her sister Ann testified that when the prosecutrix came to the car she was crying and said, "Let's go home." House, who was in the rumble seat of the car, testified that he

did not know anything about her crying, but did say that he heard something said about going home. She did not tell her sister Ann about the occurrence on that night, but told another sister the next morning.

The appellant admits having intercourse with the prosecutrix at the time and place stated by her, but denies that it was against her will or consent.

He testified that after his acquaintance with prosecutrix about two years previous to the time of the act charged, and during that interval of two years, he and the prosecutrix had been very intimate. He detailed numerous occasions, times, and places that he had had intercourse with her—naming the rooming houses, hotels, and in one instance an automobile. In some of these instances he was very strongly corroborated by other witnesses.

As the case will have to be reversed because of an error of the court in admitting incompetent evidence to which we will hereinafter refer, it will not become necessary to give a further detailed discussion of the evidence. There were many witnesses introduced on either side and the testimony is very conflicting and, indeed, very close.

It is insisted for appellant that the evidence is insufficient to support the verdict of the jury. But on this question we do not express an opinion. There was much evidence respecting the reputation for moral character of both the appellant and prosecutrix—the commonwealth seeking to establish the bad reputation of appellant and the good reputation of the prosecutrix. Much complaint is made respecting the competency of this character evidence because a number of the witnesses did not properly qualify to testify to the reputation of the parties. A number of the witnesses who at first apparently qualified as character witnesses; on cross-examination it was developed that they were not testifying from what the people generally said respecting the reputation of the parties, but frankly admitted that they were testifying from their general personal opinion, etc. In some of these instances the court excluded the evidence from the jury, while in others objections were overruled and the evidence permitted to go to the jury. Evidence relating to the character of parties not being substantive evidence but only tending

to affect the credibility of the witnesses or parties, a slight error in the admission or rejection of such evidence ordinarily is not very harmful and this is particularly true as to a single or isolated occasion. But in the instant case this error occurred so frequently it is very probable that it had considerable effect on the minds of the jury. Inasmuch as character plays an important part in trials of cases involving the question of moral character as was involved in this case, it is our conclusion that the evidence of witnesses, who testified from personal opinion or based their testimony on specific acts or anything except the general moral reputation of the parties from what the people say about them generally in the neighborhood and community where they are best known, should have been excluded. We do not mean to say that the case should be reversed because of the character evidence above referred to, but it was improper and should not occur on another trial of the case.

We now come to a question of evidence of a more serious nature. One Alma Medley, testifying in rebuttal for the commonwealth relating to the character of appellant, apparently at first qualified as a reputation witness, and stated that his moral reputation was bad. We note the following questions and answers:

"I will ask you if this defendant, by trick or subterfuge ever had illicit sexual relations with you. A. Yes, sir.

"I will ask you to tell the jury just how he worked that. (Objections were sustained to this question.)

"Q. How many days' time did this Borders under those conditions have sexual relations with you as near as you can tell the jury? (Objected to and overruled by the court.) A. Illicit?

"Q. Illicit sexual relations with you. (Objected to and overruled.) A. Three times.

"Q. Was that on different nights? A. Yes.

"Q. At that time were you his wife? A. Yes, sir. * * * I was supposed to be. * * *

"Q. Was it a fake marriage? (Objected to but no ruling by the court). A. Absolutely."

Counsel for appellant moved the court to discharge the jury, which motion was overruled. However, after this testimony had been permitted to go to the jury and after some arguing and discussion, the court admonished the jury to disregard the testimony of the witness on the subject of the sexual relation between her and the defendant "inasmuch as it is debatable whether she was his wife or not at the time," but further ruled that her testimony relating to his moral character may be considered. On cross-examination the witness was asked from whom among the people who know appellant best, she got her information. "A. I get it from myself, the trick he played on me—I am taking it the way he put the trick over on me."

This witness, like a number of others, referred to, testified to appellant's reputation from her individual and personal experience with him, and not as to his general moral reputation among the people generally who knew him best. On this point it is further cumulative of like questionable evidence of many other witnesses above referred to. But a more serious phase of this witness' testimony is that the court permitted her over the objections of appellant to testify to illicit intercourse with appellant, and that he had these relations with her under a "fake marriage."

It is a well-settled rule that evidence relating to specific acts and offenses, not connected with the offense charged, is improper and with rare exceptions is reversible error. This rule is so well known that citation of authority is unnecessary. Statements of this witness relating to her personal experience with defendant as to their sexual relations and "fake marriage" were not only inadmissible under the rules of evidence, but in the very nature of things, no doubt, was highly prejudicial, tending to prejudice the minds of the jury, notwithstanding the belated admonition of the court.

For reasons indicated the judgment is reversed, and the cause remanded for a new trial and proceedings consistent with this opinion.