## HOLT v. UNITED STATES.
### No. 1600.

Circuit Court of Appeals, Tenth Circuit.
Dec. 30, 1937.

F. Leonard Sibel and J. Forrest McCutcheon, both of Oklahoma City, Okl., for appellant.

W. C. Lewis, U. S. Atty., and Wade H. Loofbourrow, Asst. U. S. Atty., both of Oklahoma City, Okl., for the United States.

Before LEWIS and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

Art Holt, Dave Moore, Bill Adams and George Muckelroy were indicted for violations of sections 37 and 215 of the Criminal Code, 18 U.S.C.A. §§ 88, 338.

The indictment contained four counts, the first three of which charged that the defendants used the United States mails in furtherance of a scheme to defraud and the fourth of which charged that defendants, during the period from May 1, 1933, to July 24, 1934, conspired together and with other persons to use the mails in furtherance of a scheme to defraud.

Adams died before the trial and Muckelroy entered a plea of nole contendere. Holt and Moore were tried, convicted and sentenced on each of the four counts. Holt has appealed.

The substance of the scheme charged in the first three counts of the indictment is that the defendants and J. G. Alexander would represent to the persons to be defrauded that Alexander's true name was Gabe McElroy and that he was the true and lawful heir to a tract of valuable oil land situated in Rusk County, Texas, and would thereby induce the persons to be defrauded to enter into contracts and agreements with them respecting such land and the mineral rights therein and to pay them sums of money therefor, and that the defendants at the time of the formation of the scheme well knew Alexander was not Gabe McElroy and was not the true and lawful heir to such land.

The evidence established these facts: In April, 1933, Holt and Moore were introduced to A. D. Hudspeth, an oil man, by Cotton, a negro doorman at the Skirvin Hotel in Oklahoma City, Oklahoma; Holt represented to Hudspeth that they had located Gabe McElroy, a negro who had left Rusk County, Texas, about forty years prior thereto and that he was the son of Delia McElroy and heir to some valuable oil land in Texas. Holt and Hudspeth executed a contract under the terms of which Hudspeth was to participate in all moneys recovered. Hudspeth gave Holt $150.00 for expense money. Shortly thereafter Moore and Holt introduced a man as Gabe McElroy, to Hudspeth. Hudspeth gave the alleged Gabe $300.00 for executing a deed to the land. Thereafter, Holt and Hudspeth went to Longview, Texas, recorded the deed and made an investigation as to the alleged Gabe's identity. Shortly thereafter Hudspeth suggested they obtain further identification and Hudspeth, Holt and Moore took the alleged Gabe to Dallas where they met one Leipstick who was interested in a lease of the land, and a Mr. Miller, who had known the real Gabe prior to his leaving Texas. Miller asked the alleged Gabe a few questions, looked at his leg, and then said, "No, you are not Gabe McElroy." The following morning Hudspeth and Holt took the alleged Gabe to Tyler, Texas, where they interviewed John McElroy, the real Gabe's brother, and some old merchants. John McElroy greeted and identified the alleged Gabe as his brother. Hudspeth and Holt interviewed Bob Beckham who knew the real Gabe and Beckham identified the alleged Gabe as the Gabe McElroy he formerly knew. They interviewed Bud Flanagan, who had known the real Gabe. Holt asked Flanagan if he would know Gabe and he replied that he thought he would and if he did not he could identify him by talking to him; the alleged Gabe then came up and spoke to Flanagan. Flanagan stated he was not the Gabe he knew. Following a conversation between Flanagan and the alleged Gabe out of the presence of Holt and Hudspeth, Holt asked Flanagan to sign an affidavit and told him he would be paid for his trouble, but Flanagan refused to sign because "it wasn't the Gabe" he knew. Hudspeth then told Holt to go out and get affidavits from people who knew Gabe, and advanced money to cover the expenses. Holt and Moore secured a number of affidavits from persons who knew the real Gabe to the effect that the alleged Gabe was the Gabe they knew.

In September, 1933, Holt and Moore met Charles Pfile. Holt told him that Hudspeth was not living up to his agreement and more help was needed. Shortly thereafter Hudspeth withdrew from the venture. Pfile was unwilling to put up any money until he had investigated the proposition and Holt suggested that they go to Tyler and Henderson, Texas, and he would convince Pfile that he had the real Gabe.

Holt met W. D. McBee, attorney for Pfile, in August, 1933, explained the proposition to him and represented he had the real Gabe. Thereafter, McBee talked to the alleged Gabe and George McElroy, a cousin of the real Gabe, and became convinced that Holt had the right man.

Pfile entered into agreements with Holt and the alleged Gabe concerning the property. He spent about $8,300.00 on the ven-

ture, of which he paid $2,469.40 to Holt, and $25.00 to Moore. He gave money to the alleged Gabe until May 25, 1934. He paid the last money to Holt in November, 1933.

McBee testified that the alleged Gabe was arrested in May, 1934, at Henderson, where he had gone to attend a hearing in the county court; that immediately thereafter the alleged Gabe disappeared; and he thereupon concluded the alleged Gabe was an imposter and with Pfile commenced a search for him; that they located him in Memphis, Tennessee, and brought him back to Texas where he made the statement referred to hereinafter.

Holt contacted Ben Barnett during the latter part of 1933 for the purpose of obtaining aid in financing the litigation over Gabe's properties and represented that he had the real Gabe. He showed Barnett a railroad pass issued to Gabe in 1922, an employee's card issued in 1923, and a bank book showing a deposit and withdrawal in 1925, and on the faith of such representations Barnett advanced money to Holt.

The competent evidence established with reasonable certainty that Alexander was not the real Gabe.

Holt did not deny that he represented Alexander as the real Gabe McElroy to Hudspeth, Pfile, and Barnett and received money from them to finance investigations and establish the claim to the land, but he denied he knew the alleged Gabe was an imposter.

The competent evidence tending to prove knowledge by Holt that the alleged Gabe was an imposter is as follows:

George McElroy, one of the defendants, testified that Moore met him in Longview, Texas, told him he had the real Gabe and requested him to go to see the alleged Gabe; that he replied he did not know Gabe and would not go unless some of the older people went along; that upon his suggestion they picked up Mrs. Jackson and took her to Dallas; that he met Holt there and Holt offered him $5,000.00 when the title was cleared up if he would sign an affidavit that the alleged Gabe was his cousin, that he knew him prior to the time he disappeared, and that the alleged Gabe was the Gabe he previously knew; that he did not care to sign as he did not know Gabe but Holt told him it would do no harm and he signed on the promise of $5,-000.00 when the title was cleared up.

He further stated that he was present when Jim, Lula and T. P. Jackson signed an affidavit; that they refused to sign the affidavit until Holt promised them $25.00 apiece and thereupon Holt borrowed $50.-00 from him.

He also testified that at a later date Holt told him he had sold out his interest and "that he was through; that that was not the man * * * he did not say how long he had known he was not the man." He then testified that Holt had told him the alleged Gabe was not the real Gabe and he knew it all the time.

On cross-examination he testified that Holt offered him $10,000.00 out of the deal, not for signing the affidavit, but for his assistance throughout the entire transaction.

The evidence also showed that Pfile received a letter from the alleged Gabe dated January 21, 1934, which reads in part as follows:

"He [Holt] afterwards sent me a night letter from Tyler, saying that you had paid me ($800.00) eight hundred dollars for the contract I made to you, and for me to wire him his part of it, as I had now all his interest."

Hudspeth also testified that in the summer of 1933 he told Holt he was through with the deal as he thought they had the wrong negro.

■ This evidence warranted the jury in finding that Holt knew Alexander was an imposter at the time he made the representations to the various men from whom he received money. The sufficiency of the proof of the use of the mails in furtherance of the scheme is not challenged. We conclude the court did not err in denying Holt's motion for a directed verdict.

Over the objection of counsel for Holt, Pfile was permitted to testify that from his investigation he believed the alleged Gabe to be genuine until in July, 1934, when he made a statement on his deathbed; that he was present when the statement was made, in which the alleged Gabe said, "he was not Gabe McElroy; that his real name was J. G. Alexander, and that the whole thing was a fake, and the whole thing had been framed"; that "Art Holt, Dave Moore, and a fellow by the name of Adams * * * and George Muckelroy" were in it; that "they came to him with a proposition to pose as the real Gabe McElroy; that this was a valuable piece of

property in East Texas where the negro had disappeared, and they wanted him to take part, play the part of this Gabe McElroy and recover this property."

Early in the trial the statement of Alexander referred to by Pfile which had been reduced to writing and sworn to before a notary public was introduced in evidence over objection of Holt. In the statement Alexander stated he realized he was on his deathbed and had only a few days to live; that on or about May 1, 1933, he was approached by Bill Adams, a negro, at the bus station in Texarkana, who proposed that he pose as Gabe McElroy in order to secure a tract of land in Rusk County, Texas; that Adams told him the proposal would succeed because he favored the McElroy family; that about two or three weeks later Adams introduced him to Dave Moore, at the bus station in Texarkana, as J. G. Alexander; that they persuaded him to agree to pose as Gabe McElroy; that the following day Moore took him out on the highway toward Mandeville, Arkansas, about four miles from Texarkana; that Dave Moore introduced him to Art Holt saying, "This is the man that is going to pose as Gabe McElroy"; that Holt and Moore advised him they were getting another man to finance the proposition and they were expecting him that morning; that while waiting for the other man, Moore and Holt instructed him concerning the family history of Gabe McElroy in order to enable him to answer questions which they expected the other man to ask him; that thereafter another car drove up containing two men and a young lady; that the two men were introduced as Mr. A. D. Hudspeth and his son; that the lady was a notary public; that Moore and Holt told Hudspeth they had the real Gabe and introduced him to Hudspeth as Gabe McElroy; that Hudspeth asked him a number of questions concerning his family; that he told Hudspeth he had been reared in Rusk County, Texas; that he could name some of his family, but could not name them all because he had been gone for more than twenty-six years; that he entered into a contract with Hudspeth under which the latter was to provide funds to defray the cost of establishing Alexander's claim to the lands and to pay his living expenses while the litigation was pending; and that he received various sums of money from Hudspeth and divided the money with Holt, Moore and Adams.

He further detailed the efforts made to secure false proof that he was Gabe McElroy.

He stated that one Miller, in the presence of Moore, Holt and George McElroy, after asking him certain questions, stated that he was not the real Gabe McElroy; that he went to the home of John McElroy; that Dave Moore, Art Holt and George McElroy were there; and that John McElroy saluted and identified him as his brother.

He stated that he and Holt went to Kansas City and obtained a trunk being held there for Gabe McElroy; that he found signatures of Gabe McElroy in a memorandum book and on an identification card in the trunk and studied and practiced imitating the true signature of Gabe McElroy.

He stated that he received money from Pfile and paid over a good portion of it to Holt.

At the close of the case the court withdrew the statement made by Alexander and instructed the jury to disregard it. Holt then interposed a motion for a mistrial which was denied.

 Alexander was a coconspirator and the acts and declarations of a coconspirator during and in furtherance of the conspiracy are admissible against his coconspirator. But the statement made by Alexander tended to defeat rather than further the conspiracy. It was a narration of past events,—a confession of Alexander who was not on trial, and was clearly inadmissible for any purpose. In Logan v. United States, 144 U.S. 263, at page 309, 12 S.Ct. 617, 632, 36 L.Ed. 429, the court said:

"But only those acts and declarations are admissible under this rule which are done and made while the conspiracy is pending, and in furtherance of its object. After the conspiracy has come to an end, whether by success or by failure, the admissions of one conspirator, by way of narrative of past facts, are not admissible in evidence against the others."

In United States v. Lonardo, 2 Cir., 67 F.2d 883, the court said:

"We need not pause to consider whether in fact the common purpose had ended, because it would make no difference if it had not. Declarations of a confederate made after his arrest will not, except in

most unusual cases, be in furtherance of the common plan."[1]

Clearly the admission of the statement was prejudicial error.

■ It is the general rule that error in the admission of evidence is cured by withdrawing the evidence from the consideration of the jury and instructing the jury to disregard it.[2]

■ However, where the character of the evidence is such that it is likely to create so strong an impression on the minds of the jurors to the prejudice of the defendant, that they will be unable to cast it aside in the consideration of the case, a mistrial should be ordered.[3]

The statement purported to be a dying declaration. It was a full and complete narrative of what occurred between Alexander and his alleged coconspirators from the beginning. It was before the jury from early in the trial until the close of the evidence. It must have made a deep and lasting impression on the minds of the jurors. It squarely contradicted Holt's defense that he did not know Alexander was an imposter, while the competent evidence on that issue was far from conclusive.

We doubt that it was possible for the jury to efface the statement from their minds and to consider the case solely on the competent evidence adduced. In fact, we find it difficult so to do.

■ We are of the opinion that the instruction of the court to the jury to disregard the statement did not cure the error in its admission, and that the motion for a mistrial should have been granted.

Furthermore, the testimony of Pfile as to what Alexander told him at the time the statement was made was not expressly withdrawn from the jury's consideration.

■ . What appears to be an addendum to the transcript of record was signed by the trial court on October 2, 1937, long after the expiration of the time for filing the bill of exceptions. Under Rule 9 of the New Criminal Rules of May 7, 1934, 28 U.S.C. A. following section 723a, the trial court had lost jurisdiction to settle the addendum to the transcript.[4]

While this court has power under Rule 4 on motion made, to modify the order fixing the time for filing the bill of exceptions,[5] no such motion has been made and on the record presented we are not inclined to act sua sponte.

The judgment is reversed with instructions to grant Holt a new trial.

---

[1] See, also, Mayola v. United States, 9 Cir., 71 F.2d 65, 67; Tofanelli v. United States, 9 Cir., 28 F.2d 581, 582; Clark v. United States, 5 Cir., 61 F.2d 409, 410; Van Riper v. United States, 2 Cir., 13 F.2d 961, 967.

[2] Throckmorton v. Holt, 180 U.S. 552, 567, 21 S.Ct. 474, 45 L.Ed. 663; Waldron v. Waldron, 156 U.S. 361, 383, 15 S.Ct. 383, 39 L.Ed. 453; Maytag v. Cummins, 8 Cir., 260 F. 74, 80, 16 A.L. R. 712; Armour & Co. v. Kollmeyer, 8 Cir., 161 F. 78, 83, 16 L.R.A., N.S., 1110; Looker v. United States, 2 Cir., 240 F. 932, 935.

[3] Throckmorton v. Holt, supra; Waldron v. Waldron, supra; Armour & Co. v. Kollmeyer, supra; Looker v. United States, supra; Maytag v. Cummins, supra; Boyd v. United States, 142 U.S. 450, 458, 12 S.Ct. 292, 35 L.Ed. 1077; Lockhart v. United States, 9 Cir., 35 F. 2d 905, 906; C. M. Spring Drug Co. v. United States, 8 Cir., 12 F.2d 852, 858; Patterson v. State, 23 Ala.App. 428, 126 So. 420, 422; People v. McKelvey, 85 Cal.App. 769, 260 P. 397, 399; Hartman v. State, 121 Fla. 627, 164 So. 354, 355; Young v. Commonwealth, 220 Ky. 59, 294 S.W. 795, 797; Borders v. Commonwealth, 252 Ky. 577, 67 S.W.2d 960, 962; Warren v. State, 174 Miss. 63, 164 So. 234, 235, 236; Quinn v. State, 54 Okl.Cr. 179, 16 P.2d 591, 596; Stafford v. State, 125 Tex.Cr.R. 174, 67 S. W.(2d) 285, 286.

[4] Yep v. United States, 10 Cir., 81 F. 2d 637; Slade v. United States, 10 Cir., 85 F.2d 786; Goddard v. United States, 10 Cir., 86 F.2d 884; Young v. United States, 10 Cir., 88 F.2d 305.

[5] See Rule IV of the New Criminal Rules; Ray v. United States, 301 U. S. 158, 57 S.Ct. 700, 81 L.Ed. 976; Forte v. United States, 302 U.S. ——, 58 S.Ct. 180. 82 L.Ed. ——.