**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jeffrey Floyd ROBERTS, Richard Allen Lumbar, Bradley Dennis Goodsky, and Ernest Donald Drift, Defendants–Appellants.**

**Nos. 86–5482 MN to 86–5485 MN.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1987.

Decided April 13, 1988.

As Modified on Denial of Rehearing
June 21, 1988.

---

David L. Warg and Mark W. Peterson, Minneapolis, Minn., for Goodsky.

Michael McNabb, Burnsville, Minn., for Drift.

Thomas O'Connor, Minneapolis, Minn., for Roberts.

Joan Ericksen, Asst. U.S. Atty., Minneapolis, Minn., for U.S.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Defendants-appellants Ernest Drift, Bradley Goodsky, Richard Lumbar, and Jeffrey Roberts were convicted after a jury trial of bank robbery in violation of 18 U.S.C. § 2113(a). They appeal from their judgments of conviction.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291. After careful consideration of appellants' arguments, we affirm.

The convictions arise out of the July 21, 1986 robbery of Marquette Bank University (the bank), the Dinkytown Branch of Marquette Bank, in Minneapolis. Since, among other complaints, defendants have challenged the sufficiency of the evidence against them, as well as the admission of an out-of-court statement, we set out the facts in detail, excluding the challenged statement.

## I. FACTS

The bank is divided by sliding glass doors into an outer lobby area containing the walk-up teller window, and the main lobby. The main lobby was not scheduled to open until 9:00 AM. Shortly after 8:00 AM, four employees were present at the bank. Mr. Blake was waiting on customers and processing the night deposits behind the walk-up teller window, which had opened at 8:00 AM. Mr. Canfield, the teller supervisor, had just entered the main lobby and had left the sliding glass doors open for Ms. Dahl, who was following Canfield into the main lobby. The bank manager, Ms. Anderson–Lindberg, was in the main lobby behind the teller counter sorting personal deposits made the night before. Near her was a white cardboard box containing commercial night deposits in locked or zippered nylon bags with "Marquette Bank University" printed on them. Ms. Dahl entered the main lobby through the sliding glass doors at about 8:08 AM. As she turned to lock the doors, two men wearing bandannas over their faces entered the outer lobby through a side door and forced the sliding glass doors open.

The two men ordered the employees to lie on the floor, which they did. One of the men jumped over the teller counter, landing by Ms. Anderson–Lindberg. The other went around the side of the counter. They removed cash from the walk-up teller drawer and took the white box containing commercial deposit bags. A video camera took timed still shots of the robbery, which indicated that the men were only in the bank for a few minutes. A third man was seen in the outer lobby during the robbery.

Although none of the employees could identify any of the defendants, they testified that the three men had dark hair. They also testified that one of the robbers wore an off-white jersey shirt with "Michelle" printed on the back. The other wore a maroon or red zippered sweatshirt. The two robbers also wore jeans and tennis shoes. Mr. Winter, vice-president and cashier at the bank, testified that the bank was insured by FDIC on July 21, 1986. Ms. Anderson–Lindberg testified that all the checks that were stolen, $57,461.97 worth, were returned to the bank. Currency of $39,950.27 was returned to the bank, with $3,919.37 not accounted for.

Prior to the robbery, Carla Olson had dropped Mr. Canfield off at the bank. She testified that as she was leaving the bank parking lot, she saw an individual crossing the street. She later picked out photographs of Goodsky and Lumbar as possibly being the man she saw, but she could not make a positive identification.

Shortly after 8:00 AM, Lance Walter had parked his car in an alley near the bank to begin painting a house. While Walter was in the alley, a man wearing a bandanna over his face ran by carrying two bags. He was followed by another man wearing a nylon over his head, who was also running.

* The HONORABLE THOMAS E. FAIRCHILD, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The HONORABLE EDWARD J. DEVITT, Senior United States District Judge for the District of Minnesota, presiding.

Walter followed them and watched them get into an orange Camaro with the license plate RJU 392. Walter then observed a third man wearing a bandanna and carrying a large white box run to the Camaro, toss the box in, and get in himself. The Camaro drove away. Walter could not positively identify any of the men in the car.

Howard Yesnes was headed toward Highway 35–W from the University area that morning and noticed a Camaro approach rapidly and pass him on the left at a stoplight. Mr. Yesnes' car was behind and to the right of the Camaro for several blocks. He noticed four young men in the car, one of whom removed a nylon from his head. He also noticed a lot of activity in the back seat, but could not determine what was going on. Mr. Yesnes wrote down a description of the car and its occupants and called 911 when he got to work. He described the car as being rust-colored, and noted the license plate number. He recognized pictures of the orange Camaro at trial. Yesnes described the passengers as Hispanic, with dark hair, and the driver as Caucasian with red hair. He could not identify any of the individuals in the car.

Angus McDougall, who lived at 3201 15th Avenue South in Minneapolis, some five miles from the bank, testified that between 8:15 and 8:30 the morning of July 21, 1986, he heard voices and looked out his bedroom window. McDougall's apartment was in the front of the building facing west over 15th Avenue South, but the kitchen and bedroom windows faced north, overlooking 32nd Street.[2] An alley ran south behind McDougall's apartment building, and on the other side of the alley to the east was the apartment building at 3200 Bloomington Avenue South (the apartment building), wherein Jennie Roberts had her apartment (the apartment). In other words, McDougall's apartment was on the northwest corner of the block, and Ms. Roberts' apartment building was on the northeast corner.

McDougall saw four men get out of an orange car parked near the corner house across from his apartment, on 32nd Street.

McDougall described the men as being in their twenties, of "Mexican or something of that descent," but not black or white, and having dark hair. He could not specifically identify the four defendants. As they walked east towards the alley behind McDougall's building, McDougall lost sight of them, but heard one of them say they dropped something and ask another to pick it up. McDougall did not see whether anyone picked up what was dropped. Shortly thereafter, McDougall heard a radio report of a bank robbery in which an orange car was being sought. McDougall ran an errand and on the way back, wrote down the license number of the car, which was apparently the same number recorded by Walter and Yesnes. He then called 911. Before an officer arrived, McDougall saw a woman and two small children get into the car and drive away.

Officer Bateson got a call at 9:15 AM regarding McDougall's sighting of the Camaro. She arrived to question McDougall and told him to call 911 if he saw the car again. Bateson checked the alley area on the north side of 32nd Street around where McDougall said the men may have dropped something. She picked up and inventoried a blue bandanna, and then resumed patrol of the area. McDougall later noticed the car was parked next to his building on the south side of 32nd Street near the alley, and called 911 again. Sergeant Thompson heard a report at about 10:20 AM that the Camaro had again been sighted in the area of 15th Avenue South and 32nd Street. Thompson went to McDougall's apartment after he failed to find the car in the area (it had apparently been removed from its second parking spot). As Thompson interviewed McDougall, they saw the Camaro drive by heading north on 15th Avenue. It was stopped at 3131 15th Avenue South (just north of 32nd Street) by Officers Howe and Schumer. The Camaro was driven by Jennie Roberts, the tenant of the apartment at 3200 Bloomington Avenue South. Thompson joined them there.

Bateson found out over the radio that the Camaro had been stopped and knew four

---

2. We arrive at the exact locations and directions by piecing together testimony in the transcripts.

male suspects were still at large. While patrolling, she and her partner turned west from Bloomington onto 32nd Street. Bateson noticed two Mexican or Indian males walking east towards Bloomington from the alley area between McDougall's and Roberts' apartment buildings. Bateson believed the men were in their twenties and under six feet tall. One of them, later identified as Drift, was carrying what appeared to be a knapsack. The other was later identified as Goodsky. Bateson and her partner circled the block to the left and met the same individuals walking south midway on the 3200 block of Bloomington, but this time the men were empty-handed. Bateson stopped them and, when they were locked in the back of the squad car, searched the area.

Near the apartment building, Bateson found a blue shirt wrapped around a brown leather pouch, which contained money. Around another corner of the apartment building, she found a gray garbage bag containing several blue and white bandannas and a plastic pitcher. The pouch was later determined to contain $9,770.00. The pitcher contained $9,559.00. Both quantities included banded bait money specially marked by employees at Marquette Bank University. Bateson did not disturb the items, but called the Bureau of Investigation, which concluded the investigation. Bateson then placed Drift and Goodsky under arrest. Drift was later described as an American Indian with red or reddish brown hair.

Meanwhile Officer Leef arrived in the area at about 11:25 AM to back up Officer Bateson in the arrest of the two suspects. As Leef proceeded south down the alley between 15th Avenue South and Bloomington from 31st to 32nd Street (this block is directly north of the one where the apartment building is located), she passed two males, later identified as Jeffrey Roberts and Richard Lumbar, walking north toward her in the alley. They were carrying a white bag. Leef proceeded to Officer Bateson's location and asked her who the two men were. Bateson indicated they could be suspects, so Leef proceeded back up the alley in the direction the men had gone.

Meanwhile, Roberts and Lumbar crossed 15th Avenue north of Officers Howe and Schumer, who had stopped the Camaro just north of 32nd Street on 15th Avenue. Howe and Schumer lost sight of the individuals as they crossed 15th Avenue and proceeded toward the 31st Street intersection. At this time, Leef spotted the suspects walking quickly westbound at 31st Street and 15th Avenue South. When she drove towards them they began running and headed north into an alley between 15th and 14th Avenues. Howe and Schumer heard Leef on the radio indicating that two males were running just past where Howe and Schumer had lost sight of them. Howe and Schumer immediately drove their squad car north along 15th Avenue.

Howe observed Roberts emerge near a house midblock on the west side of the avenue. Howe stopped the car, ordered the suspect to stop, and placed him under arrest. On the other side of the house, Lumbar peered around the corner and ran back towards the alley. Schumer began chasing him on foot, and stopped Lumbar on Lake Street, or 30th, after drawing his revolver and ordering Lumbar to stop. Leef assisted Schumer in Lumbar's arrest, which occurred approximately two blocks north and two blocks west of the apartment building.

Officers in the area began a search for the white bag, which neither Roberts nor Lumbar had when stopped. Sergeant Dunn found the bag, opened it, and observed a towel and U.S. currency, later determined to total $10,151.00, inside. The currency included banded bait money from Marquette Bank. The bag was left in place for the Bureau of Investigation. The four suspects were transported to the station, and their clothes were inventoried.

After the Camaro had been stopped, Sgt. Thompson interviewed the woman who had been driving. After initially giving a fictitious name and address, she identified herself as Jennie Roberts, living at 3200 Bloomington Avenue South. With a squad car following her, she had continued north on 15th Avenue across 32nd Street, although the direct route toward her home would have involved turning east on 32nd at 15th. It is probable that she wanted to avoid leading the police toward her home.

Sgt. Thompson removed about $400.00 from her purse. She consented to a search of her apartment, and let officers in at about noon.

The search revealed a large amount of change on the kitchen table and a yellow garbage pail containing 45 cloth Marquette Bank bags that had been slit open; 10 to 15 paper deposit envelopes; an off-white jersey with "Michelle" printed on the back, later identified by a teller who remembered its faded lettering; a hooded, zippered burgundy sweatshirt; sweatpants; shorts; and a small amount of money. Officers also found a white bag containing 80 paper bank deposit envelopes, checks, deposit tickets, currency, coins and 12 to 15 Marquette Bank bags. The envelopes and bags had been torn or slit open and their contents had been removed. Officers also recovered a white cardboard box, which Ms. Anderson–Lindberg identified from her handwriting on it as the box that had held the commercial deposit bags. Later that week, investigators recovered a gray plastic bag containing currency and blank money orders from Donald Roubal at Arthur's Bar in Minneapolis. Of the total of $9,260.00 recovered from Roubal, $4,700.00 was in blank money orders.

Experts testified as to the analysis of the evidence found. Agent Williamson examined the bank, the ground outside the bank, and the Camaro for evidence relating to the robbery. He found an envelope on the teller counter over which one of the robbers jumped. It contained a partial shoe tread print. Williamson also made casts of shoe prints he found on the ground outside the bank. In addition, he made "lifts" of fingerprints inside the bank and on the orange Camaro. Agent Bodziak analyzed the shoe tread print found on the envelope and a cast of a shoe print made outside the bank, and compared them to the shoes of the defendants. He determined that Lumbar's shoe made the print on the envelope on the bank counter and that Goodsky's shoe made a print outside the bank.[3] Mr. Davey, an FBI fingerprint specialist, determined that the finger or palm prints or

both of each of the four defendants were lifted from the Camaro and from some of the bank envelopes found in the apartment. The prints of defendants Lumbar and Roberts were also found on the white box taken from the bank and found in the apartment's kitchen.

The white bag found near the area of Roberts' arrest on 15th Avenue South was analyzed for fingerprints by Mr. Eck of the Minneapolis Police Department. He determined that fingerprints on the white bag were those of defendant Lumbar.

The Camaro's license place was traced to A Auto Appraisers. Phil Rice, an auto salesman there, testified that on May 22, 1986, he sold an "orangish-yellow" 1976 model Camaro to Dean Guenthner. Guenthner returned a few days later with his brother, defendant Goodsky, to pay the full purchase price. Later Guenthner asked Rice about transferring title of the Camaro to Goodsky, but never completed the transfer. In the first or second week of June, Goodsky paid Rice for license plates for the Camaro. An alibi witness also identified Guenthner as being Lumbar's cousin.

Defendants Lumbar, Drift, and Goodsky presented alibi witnesses who testified that at various times they had all been at a party at Audrey Lumbar's residence, which had begun Friday afternoon, July 18 and ended Monday morning, July 21. Audrey is defendant Lumbar's sister. Different witnesses, all friends or relatives of defendant Lumbar, testified that at various times between 8:00 and 9:30 AM July 21, they had seen Lumbar at Audrey's home. A witness called by Drift testified that Drift and his sister were living with her July 21, 1986, and that at 6:30 AM that morning, Drift was asleep on her couch. Michelle Goodsky testified for her husband, defendant Brad Goodsky. She claimed she had never seen the shirt with "Michelle" on the back and that her husband had been with her at a friend's house before and at 9:00 AM the morning of the robbery.

---

3. Although the identification of Goodsky's shoeprint was not wholly positive, Bodziak's testimony indicated that it was highly unlikely any other shoe made the print.

The evidence was all circumstantial, but the concatenation of circumstances compellingly established that the three robbers observed at the bank entered the Camaro, joining a fourth. In about twenty minutes, the Camaro travelled some five miles to a location around the corner from Jennie Roberts' apartment. Four men left the Camaro and presumably entered the apartment. There, in the kitchen, the loot must have been sorted, checks and bank paraphernalia put aside, and the cash items divided into four almost equal packages. There may well have been a fifth smaller package, containing the unrecovered money.

About three hours after the robbery, the four defendants, all of whom had left fingerprints on materials stolen from the bank, were seen in pairs in the immediate vicinity of the apartment and leaving the area. At about the time the police first observed them, they hid or jettisoned portions of the robbery proceeds, and in any event, all four were apprehended in close proximity to three of the portions of loot.

We pause here to examine the evidence specifically linked to each defendant.

### A. Ernest Drift

Mr. Yesnes saw the Camaro proceeding away from the bank after the robbery. He said the driver of the car had red hair, and Drift has red or reddish-brown hair. Mr. McDougall referred generally to all the four men he saw leave the Camaro as having dark hair. Drift's fingerprints were found on the Camaro and on a manilla envelope found in the kitchen of the apartment. About three hours after the robbery, Drift was seen with defendant Goodsky in the vicinity of the Roberts' apartment. He was carrying what an officer described as a knapsack. Seen a few minutes and a short distance later, he was not carrying anything. There was found, hidden next to the apartment building, a leather-like pouch containing nearly $10,000.00, including banded bait money from the bank.

4. See footnote 3.

### B. Bradley Goodsky

One of the men who entered the bank wore an off-white jersey with "Michelle" printed on the back. Goodsky's wife's name is Michelle. The jersey was later found in the apartment. Goodsky's shoe print was preserved in a cast from the ground outside the bank.[4] His palm and fingerprints were identified on the Camaro and an envelope found in the apartment. Goodsky's brother, Dean Guenthner, owned the Camaro and had contemplated switching the title to Goodsky, and Goodsky had paid for the Camaro's license plates. Goodsky was stopped with Drift, and, in addition to the leather pouch, searchers found a gray garbage bag containing a bandanna and a pitcher by the apartment building. A bandanna was also found in the Camaro, and bandannas were worn by the two robbers in the inner lobby. The pitcher contained nearly $10,000.00, including bait money.

### C. Richard Lumbar

An envelope left on the teller counter contained the partial tread print from Lumbar's shoe. In addition, his finger or palm prints were found on the Camaro, the white box, and an envelope in the apartment. Lumbar fled when approached by police and did not stop until an officer drew his revolver. Lumbar had also been seen in the area of the apartment with Jeffrey Roberts. They were seen carrying a white bag, which was later found in an area they had run through. The bag had Lumbar's prints on it and contained about $10,000.00, including bait money from the bank. The bag also contained a towel, and a teller had testified that one of the robbers held something covered by a "type of a cloth," which the teller felt was concealing a gun or other weapon.

### D. Jeffrey Roberts

His prints were also found on the Camaro, the white box, and an envelope in the apartment. Jeffrey Roberts was seen in the vicinity of the apartment with defendant Lumbar and also fled when followed by a squad car. Although the record contains

no evidence (other than the challenged statement) of any relationship between Jennie and Jeffrey Roberts, the briefs, including those of some of the defendants, refer to them as sister and brother.

We shall later discuss defendants' challenge to the admission of the out-of-court statement of Jennie Roberts. Its principal significance was that it included assertions that the four defendants were in her apartment the morning of July 21 and at several times she saw them handling money.

## II. ADMISSION OF JENNIE ROBERTS' STATEMENT

The government had possession of a statement given by Jennie Roberts to police. In it she said that the four defendants were in the kitchen of her apartment the morning of July 21, and at times she saw them handling money. The government expected her to testify. Soon after the trial began, it appeared that she was reluctant. When called to the stand, she gave her address, and then consulted her counsel. Through counsel she insisted on immunity. Immunity from federal prosecution was granted, and the state promised immunity as well. Ultimately she was ordered to testify, she refused, was found in contempt, and committed for four months. She did not testify further.

The government offered her statement, authenticated by the questioning officer, and defendants objected on the ground that it was hearsay, and if admitted would deprive them of their right of confrontation. The court reserved ruling, but admitted the statement at the end of the trial.

Some of the facts concerning the taking of the statement were already before the jury, but additional details were made known to the court.

Police officers stopped the Camaro, which Ms. Roberts was driving, at about 11:00 AM. At first she gave a different name and address, and an explanation of her possession of the Camaro inconsistent with later statements. She had about $400.00 in a wad in her purse. After one of her children gave an officer the correct address, she was placed in the squad car and given *Miranda* warnings. About this time it was learned that other officers were making arrests of other persons in the vicinity. Ms. Roberts agreed to cooperate. She consented to a search of her apartment, opening the door for the officers. She gave information consistent with the statement received in evidence.

Later she was taken to the courthouse and gave the statement in question and answer form. It was transcribed and she read it, initialed each page, and signed it. She was not under oath. This occurred about 3:20 PM.

In addition to her observations of the four defendants in her kitchen, she asserted in substance that she and her children had been awakened that morning by loud noises. As she got up to see who it was, her brother, Jeff, looked into the bedroom and said, "It's only me." From a remark Jeff made about a window being unlocked, she understood he and his companions had been able to reach through the window and unlook the door to get in. She and her sons bathed and dressed and got ready to leave. Jeff asked her if she wanted to go shopping and he handed her some money which she did not count. "Brian" (actually Richard Lumbar) asked if she wanted to use the Camaro. She took the car and drove with the boys to K–Mart, where she spent $124.00 on clothing for the children. They returned to the apartment and Jeff asked her to go and get pop and garbage bags. They did so, making several stops, including one at a 7–11. On the way back she was stopped by the police. She had no direct knowledge as to what offense the four might have committed.

The government argues (1) that the Roberts statement was not excludable as hearsay under Rule 804(b)(5) "Other Exceptions" of Federal Rules of Evidence and (2) that there were particularized guarantees of trustworthiness sufficient to avoid conflict with the Confrontation Clause of the Sixth Amendment. When the statement is offered against a defendant in a criminal case, the two contentions are close to parallel.

Rule 804(b)(5) operates where the declarant is unavailable as a witness; the statement, though not specifically covered by exceptions 804(b)(1), (2), (3), or (4), has equivalent circumstantial guarantees of trustworthiness; the statement is offered as evidence of a material fact; it is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and the general purposes of the rules and the interests of justice will best be served by admission. There is also a requirement of fair notice, but defendants have not relied on lack of greater notice in this case.

The applicable principle as to Confrontation is stated in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980):

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Jennie Roberts was unavailable. *See* Rule 804(a)(2). The presence of the four defendants in the place where the loot was divided, and their handling of it, were material facts. In considering probative value, her personal observation of the defendants in her kitchen and their handling of the money, added something, although not much, to the circumstantial evidence which demonstrated they must have been there and that the currency had been separated from checks, change, and bank paraphernalia and divided into almost equal shares. No one has suggested that similar testimony could have been given by her two small sons.

Thus the essential quetion under Rule 804(b)(5) is whether the statement has circumstantial guarantees of trustworthiness equivalent to those in the other exceptions. The ultimately controlling question is whether it has the particularized guarantees of trustworthiness required for purposes of the Confrontation Clause. If these questions are answered affirmatively, the admission of the statement will serve the interest of justice.

The government argues three guarantees of trustworthiness: (1) It was against Jennie Roberts' penal interest to admit she had received part of the bank robbery proceeds; (2) Her statement incriminated her brother, and no reasonable person would do so unless she thought it were true; (3) All the essential elements of the statement were corroborated.

1. We give little weight to the proposition that the statement was against her penal interest. She had been found driving a car which had shortly before then been the getaway car, and in possession of an unusual amount of cash. She had probably been in custody when she gave agreed to cooperate, although perhaps not when she gave her statement. The circumstances point more obviously to strong motivation to give an innocent explanation of her possession of the car and cash than to speak the truth. She had initially given a different and untrue explanation of her possession of the car.

In *Olson v. Green,* 668 F.2d 421 (8th Cir.1982), this court considered a statement made by a person in custody and implicating another in the crime of which the declarant was accused. This court found that the statement did not carry the particularized guarantees of trustworthiness that will satisfy confrontation requirements, and observed:

> In *United States v. Riley,* 657 F.2d 1377, 1384–85 (8th Cir.1981), this court ruled that an accomplice's custodial statement implicating the defendant, although ostensibly against the declarant's interest, did not qualify for admission under Fed.R.Evid. 804(b)(3) because the circumstances did not clearly indicate the trustworthiness of the statement. Similarly, in *United States v. Love,* 592 F.2d 1022, 1026 (8th Cir.1979), we noted the

inherent unreliability of custodial statements implicating a third person when we observed that "a strong incentive to speak, whether it be truthfully or falsely ... does not indicate sufficient reliability to bring the statement within the [penal interest] exception to the hearsay rule." 668 F.2d at 428.

2. Under the circumstances the statement tended to incriminate Jennie's brother, Jeff. We agree that it is probably true that a declarant would not incriminate a sibling unless the accusation were true. The circumstances of this case fortify that conclusion as to Jennie. At trial, when by reason of the grant of immunity she had no ground to fear prosecution, she was willing to spend four months in jail rather than give testimony against him. We think this factor can be given some weight.[5]

■ 3. It is true that many of the details in the statement were corroborated, and even independently established by inference. Ms. Roberts' account of her journeys in the Camaro was corroborated by McDougall and the police, including police who observed her at the 7–11 and followed her to where she was stopped. K–Mart bags and newly purchased clothing were found in her apartment. Cash found in her purse corroborated the assertion that she had been given money. All the bank materials found in her kitchen, the arrest of the four defendants in the near vicinity, and the finding there of three of the portions of the loot, together with all the other circumstantial proof incriminating defendants, corroborate her assertion that she observed them handling money in her kitchen.

There is some question whether corroboration or independently established veracity of the assertions in a statement, if standing alone, demonstrate the type of trustworthiness referred to in Rule 804(b)(5) or *Ohio v. Roberts.*

In *United States v. Ward*, 552 F.2d 1080 (5th Cir.1977), the court held that a statement to an agent met the standards of Rule 804(b)(5). The court considered a number of details in the statement which were proved by other evidence, and said the "statement is strongly corroborated by a number of factors which, we are convinced, supply 'equivalent circumstantial guarantees of trustworthiness.'" 552 F.2d at 1083.

The Third Circuit took a somewhat different view:

We do not feel that the trustworthiness of a statement offered pursuant to the rule should be analyzed solely on the basis of the facts corroborating the authenticity of the statement. Since the rule is designed to come into play when there is a need for the evidence in order to ascertain the truth in a case, it would make little sense for a judge, in determining whether the hearsay is admissible, to examine only facts corroborating the substance of the declaration. Such an analysis in effect might increase the likelihood of admissiblity when corroborating circumstances indicate a reduced need for the introduction of the hearsay statement. We do not believe that Congress intended that "trustworthiness" be analyzed in this manner. Rather the trustworthiness of a statement should be analyzed by evaluating not only the facts corroborating the veracity of the statement, but also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely. Further, consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness.

*United States v. Bailey*, 581 F.2d 341, 349 (3d Cir.1978).

This court has held that statements met the requirements of trustworthiness under Rule 803(24), "Other Exceptions," the declarant being available, and has considered the degree of corroboration by other evidence as well as the character and circumstances of the interview. *United States v. Dorian*, 803 F.2d 1439, 1445 (8th Cir.1986); *United States v. Cree*, 778 F.2d 474, 477

---

**5.** There was no evidence that Ms. Roberts refused to testify because of intimidation. Had the defendants caused her refusal, they would have waived their right to confrontation. *United States v. Carlson*, 547 F.2d 1346, 1360 (8th Cir.1976).

(8th Cir.1985). The court found the right of confrontation had been waived in *Cree*, but the requirements of trustworthiness for that purpose fulfilled in *Dorian*.

In the case before us, Ms. Roberts gave her statement within a few hours of the events she related as occurring in her presence in her home. Care was taken so that she had a full opportunity to state the facts she had observed, and clarifying questions were asked of her and answered. Her assertions were reliably preserved. Her assertions were thoroughly corroborated by other evidence and her assertion of greatest significance to this case, that the four defendants handled the money in her kitchen, was virtually established by circumstantial evidence independent of her statement.

Defendants state that because the statement was offered and ruling reserved after the testimony of the police officer who took the statement, they chose not to cross-examine him to show the false statements initially given by Ms. Roberts. Because the court ruled the statement admissible after the close of testimony they argued that they were foreclosed from showing these impeaching facts to the jury. We think it was their burden to have moved to reopen the record for the purpose of recalling the officer and bringing out these facts if they wished to do so. In view of the degree of corroboration of the transcribed statement, Ms. Roberts' initial lies do not destroy the reliability of her later statement.

We hold, therefore, that the statement was admissible under Rule 804(b)(5) and did not violate the Confrontation Clause. In deciding that the statement has the required guarantees of trustworthiness, we rely on the degree of corroboration, and the manner in which the statement was taken and preserved, and give some weight to the improbability, to which we have referred, that Ms. Roberts would accuse her brother if it were not true.

■ Finally, even assuming that the statement denied defendants their right of confrontation, we think it clear beyond a reasonable doubt that the use of the state-

ment at trial was harmless error because of the other compelling evidence of guilt. *Cf. Olson v. Green*, 668 F.2d 421, 430 (8th Cir.1982), *quoting Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed. 2d 340 (1972).

III. OTHER CLAIMS OF ERROR

  *A. The Permissive Inferences Instruction*

■ The court instructed the jury as follows:

> Possession of money recently stolen can be a circumstance from which the jury may reasonably draw the inference, in light of the surrounding circumstances reflected in the evidence, that the person in possession of that money, actual or constructive possession, knew that that money had been stolen, and, therefore, that it was a willful act on his part to steal it. It is up to you, however, your exclusive province, to determine whether the facts and circumstances shown by the evidence in this case warrant an inference such as is justified by the law in this case.

No objection was made under Rule 30, F.R.Crim.P., although counsel for Drift referred to this instruction and remarked that he "was not able to hear the last phrase." The objection was thus waived. *United States v. Young*, 702 F.2d 133, 136 (8th Cir.1983). The appellate court may reverse only if the trial court committed plain error, affecting substantial rights, and resulting in a miscarriage of justice. *United States v. McKnight*, 799 F.2d 443, 447 (8th Cir.1986).

■ Defendants argue that the instruction set forth a mandatory, though rebuttable, presumption similar to an instruction held to have "created an unconstitutional burden-shifting presumption with respect to" an element of the crime. *Francis v. Franklin*, 471 U.S. 307, 318, 105 S.Ct. 1965, 1973, 85 L.Ed.2d 344 (1985). This argument fails because the language of the instruction clearly advised the jury of a permissive inference, and did not say that evidence to the contrary would be necessary to overcome it. In *Francis*, the Supreme Court distinguished between a man-

datory presumption and a permissive inference, and said, "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis*, 471 U.S. at 314–15, 105 S.Ct. at 1971 (*citing Ulster County Court v. Allen*, 442 U.S. 140, 157–163, 99 S.Ct. 2213, 2224–2227, 60 L.Ed.2d 777 (1979)).

Two defendants cite *United States v. Johnson*, 805 F.2d 1518 (11th Cir.1986). That opinion, however, was withdrawn. The court substituted one which disposed of the case without reaching the challenge to an instruction. *United States v. Johnson*, 812 F.2d 1329, 1330 n. 1 (11th Cir. 1986).

Several defendants point to the language in the instruction permitting a second level of inference, "and, therefore, that it was a willful act on his part to steal it."[6] On this particular record, in view of all the circumstances proved or reasonably inferrable, including the short span of time between the robbery and the proved possession, the inference was reasonable and there was no error in telling the jury so.

Some defendants point to the final clause, "such as is justified by the law in this case." The standard is "what a reasonable juror could have understood the charge as meaning." *Francis*, 471 U.S. at 316, 105 S.Ct. at 1972. They argue that a reasonable juror could have understood this clause, which modifies "inference," as making it mandatory to draw the inference, even though that construction would have contradicted the first and principal part of the same sentence, which clearly left the matter to the jury. We do not find the suggested construction reasonable.

We conclude there was no plain error.

### B. *Reference To Bellecourt as Roberts' Girlfriend*

■ Defendant Roberts contends that testimony of an FBI agent indicating that Vallerie Bellecourt was Roberts' girlfriend was prejudicial, and that his motion for

mistrial was improperly denied. FBI Agent Goergen testified that his investigation of the robbery led him to Arthur's Bar, where FBI agents questioned Bellecourt. Goergen was asked who Bellecourt was. Roberts objected to the question, but the court allowed Goergen to answer. Goergen stated that his investigation revealed Bellecourt to be Roberts' girlfriend. Objections were sustained to testimony by Goergen as to what Bellecourt said. The government had indicated that it would call Bellecourt as a witness, but did not do so.

Roberts' motion for mistrial, made after both sides rested, was denied. The district judge instead gave an instruction to the jury that he had permitted the testimony because he anticipated Bellecourt would testify. Because she did not, he said, the jury must disregard it. Roberts contends the statement that Bellecourt was his girlfriend, coupled with further testimony that Bellecourt led the FBI to Roubal, who turned over a bag containing over $9,000.00, may have persuaded the jury that it was Roberts' share of the money that was recovered from Roubal. He contends the instruction to disregard it was insufficient.

In *Nash v. United States*, 405 F.2d 1047, 1053 (8th Cir.1969), an officer was asked whether either of the two defendants had denied ownership of a bag containing stolen money orders. *Id.* The officer replied that they had not denied ownership. *Id.* Defense counsel objected and requested a mistrial on the grounds that the defendant had been under arrest and no comment could be made on his silence. *Id.* The judge instead immediately instructed the jury to disregard the question and answer. *Id.* at 1053, 1054. The conviction was affirmed. The court commented as follows:

> As was said in *Maestas v. United States*, 341 F.2d 493, 496 (10 Cir.1965):
>
> "... [I]t is the general rule that error in the admission of evidence under most circumstances may be cured by withdrawing the evidence from the jury's consideration and instructing the jury to

---

6. No defendant made an express objection to this language. Although the judge indicated that objections made at the instruction conference need not be repeated, those objections were di-

rected to an earlier version of this instruction and at material not included in the version given.

disregard it. *Holt v. United States,* 94 F.2d 90 (10th Cir. [1937]). However, as an exception to the general rule, where the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered."

*Id.* at 1053. We do not consider Goergen's testimony, in context, so highly persuasive that the jury could not disregard it, as instructed.

### C. Evidence of FDIC Insurance

Defendant Roberts contends that the government failed to prove the bank was insured by the Federal Deposit Insurance Corporation (FDIC) when robbed, an essential element of the charged offense.

■ Douglas winter, vice-president and cashier at the bank, testified that he was responsible for making sure that the bank was insured by FDIC. Winter identified a copy of the original FDIC certificate and a copy of a check that Winter said paid for coverage for the period July 1, 1986 through December 31, 1986. On cross-examination Winter noted that the check had been processed on July 24, three days after the robbery. He explained that the bank had until July 31 to make the payment for the coverage in question, and was definitely covered by FDIC on July 21, 1986.

In *United States v. Teague,* 445 F.2d 114 (7th Cir.1971), the Seventh Circuit upheld the introduction of a certificate and a premium notice. The court stated as follows:

> Procuring and maintaining insurance is a fundamental and necessary business operation for institutions dealing with large sums of money.... The documents themselves contain nothing which detract from their authenticity.... The person who makes the records need not testify "... if a person does testify who is in a position to attest to the authenticity of the records."

445 F.2d at 119 (citation omitted).

Winter was in a position to attest to the authenticity of the documents in question. The evidence was carefully considered by the court below and we find no abuse of discretion in its admission. We are also satisfied that the evidence was sufficient to allow a jury to conclude that the bank had been insured by FDIC on the date of the robbery.

### D. Improper Cross–Examination of Alibi Witness

■ Pamela Ellis appeared as an alibi witness for defendant Lumbar. In the course of her testimony, she described a party at Audrey Lumbar's residence that both Ms. Ellis and the defendant had attended. On cross-examination the prosecutor asked Ms. Ellis whether anyone at this party had jobs. The prosecutor later asked if Audrey Lumbar had a job.

This cross-examination appears to have been directed at determining how well Ellis knew the individuals at the party. Defendant Lumbar contends that the questions were improper cross-examination calculated to impeach the other alibi witnesses who attended the party. "The permissible extent of cross-examination is a matter within the broad discretion of the district court." *United States v. Schepp,* 746 F.2d 406, 410 (8th Cir.1984). We find no abuse of discretion here.

### E. Chain of Custody of Envelope Showing Tread Print of Shoe

■ Defendant Lumbar argues that the chain of custody of Exhibit 7, the envelope containing the partial shoe tread print, was not established because the evidence control clerk did not testify.

In *United States v. Anderson,* 654 F.2d 1264 (8th Cir.1981), this court relied on the District of Columbia Circuit's analysis for chain of custody challenges. The court stated as follows:

> The principles governing chain of custody challenges were outlined in *United States v. Lane,* 591 F.2d 961 (D.C.Cir. 1979), as follows:
>
> > Tangible evidence of crime is admissible when shown to be "in substantially the same condition as when the crime was committed." And it is to be presumed that the integrity of evidence routinely handled by governmen-

tal officials was suitably preserved "[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering." If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.

The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. "[T]he possibility of misidentification and adulteration must be eliminated," we have said, "not absolutely, but as a matter of reasonable probability." So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.

*Id.* at 962 (footnotes omitted). *See also United States v. Brown,* 482 F.2d 1226, 1228 (8th Cir.1973); *Brewer v. United States,* 353 F.2d 260, 262–63 (8th Cir.1965).

654 F.2d at 1267. As in *Anderson,* defendant Lumbar has produced no evidence of tampering or improper motive by the government. Agent Williamson testified that he found the envelope on a teller counter in the bank, put the envelope in a box, marked it, and turned it over to the evidence control clerk. Agent Goergen mailed the envelope, along with much of the other evidence, to Washington, DC, where it was examined by an expert. The expert who examined the envelope initialed it, sent it back to the FBI in Minneapolis, and testified that the envelope was in the same physical condition as when he first examined it. Williamson also noted at trial that the envelope looked substantially the same as the day of the robbery and still had a faint print on it.

We are satisfied that chain of custody of Exhibit 7 was adequately shown.

The judgments are AFFIRMED.